# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————X

COMPUTER ASSOCIATES INTERNATIONAL, INC.,     :
                                             :    Civil Action No.
                          Plaintiff,         :    04 CV 09134 (LTS)(KNF)
                                             :
              - against -                    :    AFFIDAVIT OF
                                             :    JAY PRICE
AMX INTERNATIONAL, INC.,                      :
                                             :
                          Defendant.         :
                                             :
————————————————————X

STATE OF IDAHO            )
                         ) ss.:
COUNTY OF BONNEVILLE      )

I, Jay Price, having first been sworn, depose and state:

1.   I am president of AMX, defendant in the above captioned matter.

2.   I am competent to testify and do so from personal knowledge.

3.   AMX is an Idaho company that, in addition to other things, provides clients with enterprise business planning and solutions software.

4.   On July 24, 2000, Computer Associates International, Inc. (CA) licensed Cool:Gen to AMX through a license agreement (Contract No. 585605). There was an order form signed relating to this contract on July 31, 2000. The term was for five years.

5.   On July 31, 2000, CA and AMX entered into an Independent Software Vendor Agreement (Vendor Agreement). Under this agreement, AMX licensed Cool:Gen to use in connection with Utiligy (AMX's proprietary application Utiligy.). The term was for five years.

6.   The software documentation and marketing material provided to AMX, associated with Cool:Gen, explicitly stated that Cool:Gen was compatible with any operating system,

including, but not limited to UNIX Sun, UNIX HP, Windows NT and mainframes and any data base including, but not limited to Oracle and Sequel.

7. The software documentation and marketing material provided to AMX, associated with Cool:Gen, explicitly stated that it was "infinitely" scalable, said scalability limits determined only by hardware limitations.

8. Utiligy is a utility billing system that is used by public utility companies, cities, and counties. Utiligy took approximately 30 months to develop.

9. A document entitled Commercial Terms Schedule was incorporated into the Vendor Agreement by reference (collectively the contract).

10. From August of 2000 to February of 2002 the AMX programmers attempted to generate Utiligy code through Cool:Gen. The platform used for the product was Windows NT operating system, however AMX encountered repeated problems with freeze ups.

11. In December of 2002, an AMX client, the City of Huntington Beach, California, experienced repeated Utiligy freeze ups. These freeze ups would prevent the Utiligy application from completing its utility billing for each respective billing cycle. The freeze up prevented the periodic billing of approximately 60,000 utility customers in Huntington Beach alone.

12. In April 2003, AMX programmers ultimately discovered the AEF Asynchronous Daemon (daemon), a Cool:Gen component, was the cause of the freeze up problem.

13. In April 2003, the AMX programmers provided CA support with notice of the daemon problem.

14. CA support represented that if the daemon problem were real, then AMX had found a significant defect in the Cool:Gen software.

15. As AMX and CA addressed the daemon problem in April 2003, the parties determined that the daemon problem was real, and that it needed to be cured.

2

16. AMX advised CA that the daemon problem was creating significant problems between AMX and its clients.

17. CA never corrected the problem.

18. AMX notified CA of its breach of contract on numerous occasions including letters dated January 5, 2004 and February 17, 2004.

19. Between September 16, 2000 and April 16, 2007, AMX paid CA a total of $831,165.00.

20. Ultimately, CA sued AMX to collect what it alleged was the balance due remaining on the contract. AMX counterclaimed for breach of contract and warranties.

21. The litigation settled in July of 2005. I was AMX's representative in negotiating the Negotiated Settlement Agreement (the agreement) and am familiar with the background leading up to the agreement and the terms of the agreement.

22. It was AMX's intent in July of 2005 to transfer all existing Utiligy clients to different software.

23. AMX has made its best efforts to comply with the agreement, includinging payment of the scheduled payments totaling $100,000, filing certification as to returned products, providing CA with an explanation related to its failure to return certain products ("Exhibit A").

24. AMX initially discontinued all use of the Cool:Gen tool per the terms of the agreement. However, AMX has, at this point in time, due to the complexities of the software, been unable to transition three of AMX's existing clients, the Guam Power Authority, Donna Anna County, New Mexico and the City of Huntington Beach, California.

25. These three clients require ongoing support in the form of occasional bug fixes, comprising approximately 10 hours per month. Utilization of the now obsolete and unsupported Cool:Gen 6.0 tool set is the only possible method of servicing these clients.

3

26. The consequence of not providing services to these clients means the literal cessation of a significant part of their business.

27. One of the clients that utilize the Utiligy software is Guam Power Authority (GPA). Of the approximately 10 hours per month that AMX anticipates, approximately 95% of support will be for GPA. If GPA's Utiligy software fails and stays down for an extended period of time, there would serious repercussions for the entire island territory of Guam.

28. The ongoing support for Guam is imperative. I have personally met with the governor of Guam and Secretary of Interior, Dirk Kempthorne, and I have assured them of AMX's commitment and ongoing support.

29. Once the need for ongoing Cool:Gen support was identified and it was clear CA was not interested in licensing the product, AMX sought to assign its maintenance responsibilities.

30. AMX is currently employing its best efforts to transition these three clients away from relying on the Cool:Gen tool set. In the interim, AMX has entertained and considered multiple possibilities for its clients.

31. AMX has approached CA, both directly and via its partners, about licensing the Cool:Gen tool set. AMX has also approached CA distributors. AMX has had several discussions with CA salespeople and distributors over the past nine months. For example, on April 13, 2007, I contacted Howard Erlick and Andrew Micalas, CA sales representatives, about receiving a quote for a single CA license. AMX was told by the salespeople and distributors that there would be no problem selling AMX the Cool:Gen tool set but all communications with the salespeople and distributors were interrupted and ceased when AMX tried to obtain the license.

32. I also spoke with two other individuals who were CA employees: Adam Slustskin and Kevin Bacon.

33. On April 16, 2007, Kevin Bacon contacted me and informed me that CA could not sell the desired product directly but that I would have to go through one of CA's resellers. I

4

expressed concern given the need for immediate support in Guam and I was told to continue to use the Cool:Gen product until we could properly purchase the product.

34.  Network Consulting Services (NCS), a CA distributor, contacted me on or about April 17, 2007, and indicated its desire to assist in the purchase.

35.  I received a phone call a day or two later from NCS explaining that since the software was obsolete that AMX would have to purchase the product directly from CA.

36.  I have been actively communicating with Mr. Chad Person, CA's Alliance Director for price terms, for several weeks, including conversations that continue as this affidavit is being prepared.

37.  AMX sent CA's president two letters (collectively "Exhibit B") explaining its predicament; specifically, the letter detailed that AMX had customers who continued to rely on the Cool:Gen tool along with  a good faith payment of $12,500.00 to be used toward purchase of a license. This check was initially cashed by CA and then funds were later returned to AMX after which the current motion was filed.

38.  Due to CA's non-cooperation with AMX, AMX has been forced to explore alternative options for its clients' protection.  AMX has contacted various third parties that specialize in Cool:Gen support of legacy applications for companies and situations identical to AMX.  These parties already have the required licenses that would make assignment of AMX's responsibilities possible.  Several parties of this type have been contacted and AMX has entered into discussions with two of these entities, Canam Software and QA Technologies.  The objective of these discussions is to eventually assign AMX's maintenance responsibilities to one of these entities.  There is concern that CA may retaliate against these entities should they assume the support responsibilities for AMX.  Assignment of these responsibilities is the easiest, most logical approach to dealing with this problem.  It is my objective to support AMX's clients

5

legitimately through a third party and it can be done so long as CA agrees to not retaliate against these third parties. This approach would eliminate any further dealings between CA and AMX.

39.    CA provided a quote to a third party for purchase of the required software for $29,000.00. This price was for a perpetual license.

40.  CA has indicated to AMX a "willingness" to further license the three remaining licenses, however the price associated is prohibitive. ("Exhibit C").

41.  CA is demanding that AMX pay a license fee of $41,000.00 for each year of use plus a penalty for previous use. The estimated time to completely transition AMX's clients off of the Cool:Gen tool would be two years. Thus, CA is demanding that AMX pay at least $82,000.00 for a license. This fee will increase based on the penalty CA would impose on AMX for any previous use. AMX is actually faced with paying in excess of $100,000.00 for a product that would have cost substantially less in November of 2006.

42.  AMX does not intend on using the Cool:Gen tool to develop a new program or to market some product that would economically benefit AMX. All AMX seeks to do is provide maintenance services to its clients preferably through a third party without interference. AMX would prefer walking away from CA and Cool:Gen entirely but cannot abandon its clients, especially the island of Guam, in good faith. AMX seeks to provide a service without benefiting monetarily. From the use of the product AMX has lost several millions of dollars.

43.    AMX will return the Permitted Products, in their entirety, to CA.  AMX will submit

the proper certification to CA that it has erased all copies of the Permitted Products from AMX's

equipment.  AMX will submit itself to an audit in order for CA to confirm that AMX has

complied and eliminated all copies of the Permitted Products from its equipment.

_____
JAY PRICE

Subscribed and sworn to before me this _16_ day of July, 2007.

_____
Notary Public for the State of Idaho
Residing at: Idaho Falls, ID
My commission expires: 8/2/12
(SEAL)

7

**EXHIBIT "A"**

**Beard St.Clair**

*Attorneys*

Attorneys admitted in
Idaho Oregon Washington Wyoming

**Michael D. Gaffney**
Partner
2105 Coronado Street ▪ Idaho Falls, ID 83404
Phone (208) 557-5203 ▪ Fax (208) 529-9732
Assistant (Jessica) (208) 557-5223
Email gaffney@beardstclair.com
Admitted in Idaho, Wyoming & Oregon



**VIA FACSIMILE: (516) 227-0777**

October 19, 2006

John McEntee
Farrell Fritz, P.C.
1320 Reckson Plaza
Uniondale, NY 11556-0700

*Re: Computer Associates v. AMX International*

Dear John:

This is in response to your October 5, 2006 letter in the above referenced matter. I have had an opportunity to discuss this matter with Jay Price, the president of AMX and would respond as follows. The $100,000 payments identified in paragraph 4a of the Negotiated Settlement Agreement were timely made as were the "surrendered products" referenced in paragraph 4b surrendered in a timely fashion.

The "permitted products" identified in paragraph 4c apparently have not been returned due to miscommunication between Mr. Price and the employees directed to return said items. I assure you that this was simply an oversight and I have instructed AMX to make sure the permitted products are returned to Computer Associates within ten days.

I explained to Mr. Price that the final surrender date could be extended to September 1, 2006 payment of $25,000; however, I would ask that your client waive this payment because, as noted, this truly was simply an oversight and not a deliberate attempt to retain the permitted products.

The letter which you sent does not indicate that Computer Associates has made any decision to take affirmative action at this point, thus I assume that this explanation will be adequate and resolve the matter. If this is not the case, please notify me immediately.

Thank you for your cooperation. If you have any questions, please do not hesitate to contact me.

Yours truly,

Michael D. Gaffney

cc: Jay Price

EXHIBIT _____A_____

Jared W. Allen     John M. Avondet     Winston V. Beard     Jeffrey D. Brunson     Gregory C. Calder     Kari Marie Campos     Michael D. Gaffney
Blair J. Grover, of Counsel     Jarin O. Hammer     Harlow J. McNamara     Nathan M. Olsen     John G. St. Clair     Julie Stomper

# EXHIBIT "B"



management & information technology consultants

March 6, 2007

Mr. John Swanson, President
Computer Associates
One CA Plaza
Islandia, NY 11749

Dear Mr. Swanson

I have an urgent matter I wish to bring to your attention. In 2000, AMX International purchased licenses for the Computer Associates' COOL:Gen product for the purpose of commercial development for AMX's Utility Billing and Customer Information System (CIS) named AMX UTILIGY.

AMX paid Computer Associates nearly a million dollars over a 5 year period for a product that never really worked. In addition to the cost of the software, AMX spent several years and nearly $6 million dollars in development only to find out that the COOL:Gen product was not suitable for commercial software development. We believe that based on the published specifications of the product, it was, in fact, defective.

Despite the many problems, AMX developed an acceptable demo and was able to sell its UTILIGY application system to 8 customers. Due to the extensive problems associated with COOL:Gen, only 4 customers ever went live on the system. AMX has foregone and/or refunded many thousands of dollars to these several accounts in order to stay out of court.

On 02/11/2005, AMX entered into a settlement agreement with CA whereby CA would forgive AMX of all outstanding amounts due. In return AMX would be allowed to continue to use 8 developer licenses of the Variant of COOL:Gen tool to complete key development in order to finish up the go-live process for our key customer and to continue to provide periodic support of the other three active clients. As agreed to in this settlement, AMX paid CA quarterly payments of $25,000 per quarter starting 02/08/05 and ending 05/04/06.

AMX fully expected to have migrated the remaining 4 customers to a stable platform by now, which would have resulted in the retirement of all COOL:Gen made code. However, AMX has been unable to complete this task due to cash flow issues primarily caused by the problems associated with the tool. Our four clients are now demanding occasional fixes and changes to the code which we are unable to make without the COOL:Gen system.

Our requirement to access the COOL:Gen code generator is very infrequent, but vitally necessary. One client in particular, Guam Power Association, is operating under very tenuous circumstances due to our inability to provide them with critical software patches. Guam Power Association is a critical account since it provides electricity for US bases which are strategic defense positions in the Korean, Japan, and China theaters.

EXHIBIT   B

Mr. John Swainson
Computer Associates
March 6, 2007
Page 2

AMX has examined all possible alternatives including having our client license the software and/or assigning the maintenance to a third party that owns this version of the software. We have also found that working directly with the generated C-code is nearly impossible. In the absence of other options, we are requesting that AMX be permitted to use the COOL:Gen version 6 tool (consisting of one developer license) for occasional use only. See the attached worksheet for the product codes required.

In as much as this version is totally obsolete, AMX understands that no help-desk support or other documentation or help is available at any time from CA. AMX will accept it without warranties or help-desk support.

Since AMX's previous inquiries regarding the use of this product have gone unanswered by CA and since we have clients that need immediate fixes that can be made only via this product, I have no other choice than to send you a check for its use and trust that CA will appreciate our predicament and our openness. Based on the previous agreement for 3 licenses for $100,000, I have enclosed a check for $12,400 for a single license for occasional but critical bug fixes.

Having access to this obsolete software would help to ensure that our 4 remaining clients can continue to do business and bill their customers, and that they do not bring legal action against AMX.

Please accept this check for the use of the COOL:Gen version 6.0 license.

Thank you for your cooperation.

Regards,

Jay Price
President


Enclosure

 management & information technology consultants

March 14, 2007

Mr. John Swainson, President
Computer Associates
One CA Plaza
Islandia, NY 11749

Dear Mr. Swainson:

By now you should have received my letter dated March 5, 2007. For your information and convenience, I have enclosed a copy of the AMX check for $12,500 that was sent to your office in Dallas, Texas.

Thank you for your assistance in this matter.

Best regards,

Jay Price, President

**EXHIBIT "C"**



**Farrell Fritz, P.C.**

1320 Reckson Plaza
Uniondale, New York 11556-1320
Telephone 516.227.0700
Fax 516.227.0777
www.farrellfritz.com

John P. McEntee
Partner

Direct Dial 516.227.0608
Direct Fax 516.336.2219
jmcentee@farrellfritz.com

Our File No.
14197-138

March 27, 2007

By Express Mail
AMX International, Inc.
c/o Michael D. Gaffney
Beard St. Clair
2105 Coronado Street
Idaho Falls, ID 83404

Re:     AMX International, Inc.

Dear Sir/Madam:

This firm represents CA, Inc., formerly known as Computer Associates International, Inc. ("CA"). I write to respond to the letter of Jay Price of AMX International, Inc. ("AMX") to John Swainson of CA dated March 6, 2007.

On October 21, 2003, an order ("Order") was entered in the United States District Court for the Southern District of New York in an action ("Action") by CA against AMX dismissing the Action pursuant to a Negotiated Settlement Agreement ("Agreement") between the parties. The Order provides that the Court retains continuing jurisdiction to enforce the Agreement.

The Agreement required AMX to deliver to Plaintiff, on or before June 1, 2006 (defined in the Agreement as the "Final Surrender Date"), certain products defined as "Permitted Products," together with a certification stating that AMX has stopped all use of the Permitted Products, has deleted all copies of the Permitted Products from all computer libraries and storage devices, and has returned to CA all electronic media, documentation, and other items relating to the Permitted Products. The Agreement further provides AMX had the option to extend the Final Surrender Date to September 1, 2006, provided it paid to CA $25,000 on or before May 15, 2006.

On October 5, 2006 I wrote to AMX advising it that it was in default of its obligations under the Agreement, for it failed to deliver the Permitted Products, failed to provide the required certification, and failed to make the installment of $25,000 due on or before May 15, 2006. No attempt was made by AMX to cure this breach of the Agreement.

**EXHIBIT _____C_____**

Bridgehampton     •     East Hampton     •     Melville     •     New York

AMX International, Inc.
c/o Michael D. Gaffney
March 27, 2007
Page 2

CA once again demands that AMX comply with its obligations under the Agreement. In the event that it fails to do so by no later than April 10, 2007, CA will exercise all of its rights and remedies under the Agreement (including, but not limited to, filing a motion to enforce the Agreement).

Turning specifically to Mr. Price's letter, although the letter states that a check in the amount of $18,500 was enclosed, I am advised that no such check was enclosed. As a result, we are unable to return the check. In addition, if AMX wants to license CA software prospectively, an arrangement on the terms of such a license would be required. The list price of such a license (without maintenance) would, however, be several multiples of the amount that AMX has offered (but not proffered).

Please contact me upon your receipt of this letter to advise whether AMX (a) will comply forthwith with its obligations under the Agreement and (b) wants to license the CA software at issue under CA's standard pricing, terms, and conditions.

Very truly yours,

John F. McKmee

JFM/

cc:   Alexander G. Aram, Esq.
      (by electronic mail)